# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2023-1327

_____

HALIFAX HOSPITAL MEDICAL
CENTER, d/b/a Halifax Health,

    Appellant,

    v.

OFFICE OF THE ATTORNEY
GENERAL, DEPARTMENT OF
LEGAL AFFAIRS, STATE OF
FLORIDA, et al.,

    Appellees.

_____

No. 1D2023-1394

_____

NORTH BROWARD HOSPITAL
DISTRICT, d/b/a Broward Health,

    Appellant,

    v.

OFFICE OF THE ATTORNEY
GENERAL, DEPARTMENT OF
LEGAL AFFAIRS, STATE OF
FLORIDA, et al.

    Appellees.

_____

No. 1D2023-1481
_____

SOUTH BROWARD HOSPITAL
DISTRICT, d/b/a Memorial
Healthcare System,

     Appellant,

     v.

OFFICE OF THE ATTORNEY
GENERAL, DEPARTMENT OF
LEGAL AFFAIRS, STATE OF
FLORIDA, et al.,

     Appellees.

_____

No. 1D2023-1484
_____

SCHOOL BOARD OF MIAMI-DADE
COUNTY and PUTNAM COUNTY
SCHOOL BOARD,

     Appellants,

     v.

OFFICE OF THE ATTORNEY
GENERAL, DEPARTMENT OF
LEGAL AFFAIRS, STATE OF
FLORIDA, et al.,

     Appellees.

_____

No. 1D2023-1500
_____

SARASOTA COUNTY PUBLIC
HOSPITAL DISTRICT, d/b/a
Sarasota Memorial Healthcare
System, Inc.,

    Appellant,

    v.

OFFICE OF THE ATTORNEY
GENERAL, DEPARTMENT OF
LEGAL AFFAIRS, STATE OF
FLORIDA, et al.,

    Appellees.

_____

No. 1D2023-1529
_____

PUTNAM COUNTY SCHOOL
BOARD,

    Appellant,

    v.

OFFICE OF THE ATTORNEY
GENERAL, DEPARTMENT OF
LEGAL AFFAIRS, STATE OF
FLORIDA, et al.,

    Appellees.

3

_____

No. 1D2023-1570
_____

LEE MEMORIAL HEALTH SYSTEM,
d/b/a Lee Health,

    Appellant,

    v.

OFFICE OF THE ATTORNEY
GENERAL, DEPARTMENT OF
LEGAL AFFAIRS, STATE OF
FLORIDA, et al.,

    Appellees.

_____

On appeal from the Circuit Court for Leon County.
John C. Cooper, Judge.

August 14, 2024

B.L. THOMAS, J.

The Attorney General filed suit on behalf of the State of Florida against certain opioid manufacturers, distributors, or prescribers (the "Opioid Defendants") to combat the opioid-addiction epidemic. After the State filed suit, Appellants—school boards, legislatively created hospital districts, and Lee Hospital System, all "subdivisions" of the state under organic and general law—filed separate lawsuits against the Opioid Defendants, alleging similar claims but asserting unique and individualized damages.

4

The Attorney General ultimately settled the State's suits against the Opioid Defendants, providing for compensation to many political subdivisions, but no compensation for Appellants, which the Attorney General disavowed representing in the suit. The releases in the settlement agreements required, however, that the Attorney General would seek to dismiss Appellants' claims by intervening in their cases and filing a motion to dismiss, by commencing a declaratory judgment action, or by seeking legislation barring the subdivisions from prosecuting their claims. The settlement agreements also provided that no entity could ultimately receive any portion of the settlements' remediation payment or litigation costs payment unless that entity accepted the terms of the settlement agreements. In other words, unless Appellants waived all their claims for damages inflicted by the Opioid Defendants and dismissed their suits for their individual damages claims, the Attorney General would take action against Appellants and seek to extinguish their damage claims. As Appellant North Broward Hospital District notes, however, "no public hospital has signed off on the Attorney General's settlements, and for good reason: no portion of the settlement proceeds were allocated to public hospitals."

In fact, the Attorney General denied any intention of quantifying or recovering these damages. Instead, as required by the settlement, the Attorney General filed suit against Appellants in circuit court seeking a declaratory judgment finding that despite this fact, she had the authority under common and general law to release the Appellants' claims against the Opioid Defendants and that the settlement agreements accomplished that release.

The circuit court entered a declaratory judgment in favor of the Attorney General. That court ruled that the Legislature had granted the Attorney General the authority to enforce consumer protection laws, including the authority to bring an action on behalf of consumers or governmental entities. The court concluded that the Attorney General had the power to release claims, including the Appellants' legal claims for actual and individual damages different than those generally inflicted on the state as a whole. The court further concluded that it was legally irrelevant that the Attorney General never notified the Appellants of her actions to reach a "Global Settlement" that purportedly eliminated

5

the Appellants' legal claims. The circuit court ruled that the Attorney General acted as the state sovereign who controlled all legal rights and remedies of independent state bodies created by the constitution and general law. Thus, the Attorney General could waive and eliminate Appellants' legitimate damage claims against the Opioid Defendants.

We reverse.

I.

The opioid-addiction epidemic in the United States has directly or indirectly killed approximately 645,000 Americans by overdose. This drug epidemic killed more Americans than those lost in World War II, Korea, and Vietnam, combined.

In May 2017, Governor Rick Scott declared opioid overdoses a public health emergency in Florida.

One year later, the Attorney General filed a complaint in the Sixth Judicial Circuit, against some opioid manufacturers and distributors who operated in Florida. The complaint alleged violations of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), Florida's Racketeer Influenced and Corrupt Organizations (RICO) Act, public nuisance, and negligence. The Attorney General amended the complaint to add claims against two pharmacy chains that dispensed opioids in Florida.

Beginning in 2019, Appellants filed suits against the Opioid Defendants. They alleged that they had "incurred massive costs by providing uncompensated care as a result of opioid-related conditions." Their claims included violations of Florida's RICO Act, violation of FDUTPA, false and misleading advertising, negligence, nuisance, and unjust enrichment. The Attorney General neither sought to intervene in any of these suits nor notified Appellants of any assertion that she could unilaterally extinguish their legitimate legal claims.

The Attorney General, along with other states' attorneys general and others negotiated with multiple Opioid Defendants.

6

The Attorney General finalized settlement agreements with seven groups of Opioid Defendants, and consent judgments were entered. Each of the opioid settlements included the requirement that the Attorney General seek to dismiss or otherwise extinguish Appellants' claims:

> [I]f any [legal] Action remains pending against one or more Releasees after the Effective Date of the Agreement or is filed by a Subdivision against any Releasee on or after the Execution Date, Plaintiff will seek to obtain dismissal of such Action as to such Releasees as soon as reasonably possible. Depending on facts and circumstances, Plaintiff may seek dismissal, among other ways, by intervening in such Action to move to dismiss or otherwise terminate the Subdivision's Claims in the Action or by commencing a declaratory judgment or other action that establishes a Bar to the Subdivision's Claims and Action. For avoidance of doubt, Plaintiff will seek dismissal of an Action under this paragraph regardless [of] whether the Subdivision in such Action is a Participating Subdivision.

> In the event that the actions required of Plaintiff . . . fail to secure the prompt dismissal or termination of any Action by any Subdivision against any Releasee, Plaintiff shall seek enactment of a legislative Bar as defined in Section A(d)(1) and will endeavor to achieve enactment as soon as is practicable. Participating Subdivisions agree not to oppose any effort by Plaintiff to achieve enactment of a legislative Bar.

The agreements defined the legislative bar as follows:

> "Bar" means either: (1) a law barring all Subdivisions in the State of Florida from maintaining Released Claims against Releasees (either through a direct bar or through a grant of authority to release Claims and the exercise of such authority in full) or (2) a ruling by the Florida Supreme Court (or a District Court of Appeal if a decision is not subject to further review by the Florida Supreme Court) setting forth the general principle that Subdivisions in the State of Florida may

7

not maintain any Released Claims against Releasees, whether on the ground of this Agreement (or the release in it) or otherwise. For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Releasee . . . shall not constitute a Bar.

The agreements also provided that a political subdivision could not receive any portion of the remediation payment or litigation costs payment unless the subdivision accepted the terms of the settlement agreements.

Before filing the declaratory action below, the Attorney General advocated for legislation recognizing that "[it] is in the interest of the state that a single official represent governmental entities in civil proceedings in matters of great governmental concern to maximize recoveries and minimize costs" and declaring that "[t]he Attorney General is the state's chief legal officer and is the official that should be responsible for the prosecution, management, and coordination of any civil proceedings brought by governmental entities in matters of great governmental concern." Fla. SB 102, § 1 (2021). The proposed legislation would have established procedures for the Attorney General to: 1) "institute or intervene in any civil proceeding in state or federal court . . . on behalf of a governmental entity to seek any relief afforded at law or in equity . . . pertaining to a matter of great governmental concern"; 2) "consolidate, dismiss, release, settle, or take action that he or she believes to be in the public interest in any civil proceeding in state or federal court pertaining to a matter of great governmental concern"; and 3) declare a matter of "great governmental concern," thereby staying any civil proceeding pertaining to the matter unless the Attorney General takes action in the proceeding. *Id.* The legislation also would have made any settlement undertaken in a civil proceeding by a government entity after the declaration that the case involved a "matter of great governmental concern" void *if the Attorney General did not consent to the settlement. Id.* This proposed legislation was not approved by the 2021 Legislature.

In 2022, the Legislature did approve legislation creating the Opioid Settlement Clearing Trust Fund within the Department of Financial Services, to hold monies from the opioid settlements.

§ 17.42(1), Fla. Stat. The legislation also created a task force to operate with local subdivisions to collect information related to substance-abuse disorders. § 17.42(4)(b), Fla. Stat. The legislation allows funds to be disbursed to the opioid settlement trust funds of the various agencies as provided in the General Appropriations Act, for use to abate the opioid epidemic. *See* § 17.42(5), (6), Fla. Stat. This fund does not compensate Appellants for losses and damages caused by the Opioid Defendants.

After the State's opioid settlements had been finalized in June 2022, the Attorney General filed a complaint, later amended, for declaratory relief against Appellants. This complaint alleged that the Attorney General had the power to release Appellants' claims because the Attorney General exercised Florida's sovereign authority under common law and the Florida Constitution. She asserted that Appellants, as administrative "creatures of the state," have jurisdiction to bring certain legal claims, but their authority flows only from the State. Thus, where overlapping jurisdiction exists, the Attorney General's asserted claims are superior, according to this theory.

The amended complaint alleged that Appellants' inferior claims placed the Attorney General's settlements in jeopardy. The Attorney General sought the declaratory judgment pursuant to sections 86.011, 86.021, and 86.101, Florida Statutes. The Attorney General argues that she had the power to release, and did release, Appellants' subordinate claims through the execution of settlement agreements and release provisions with the Opioid Defendants. She asserts here that the trial court correctly granted summary judgment ruling that Appellants could not assert their legal claims, despite statutory authority to the contrary granting Appellants the right to sue and be sued.

## II.

The Attorney General cannot disavow the substantive vested rights of Appellants, including the two school boards created under the constitution, all of which have the power to sue to protect those vested rights and the hospital districts. *See* Fla. Const. art. IX, § 4(b) ("The school board shall operate, control and supervise all free public schools within the school district . . . ."); § 1001.32(2), Fla.

9

Stat. ("district school boards shall operate, control, and supervise all free public schools in their respective districts and may exercise any power except as expressly prohibited by the State Constitution or general law.")'; § 1001.41(4), Fla. Stat. (granting district school boards the power to sue and be sued); Ch. 2007-299, § 4, Laws of Fla. (establishing North Broward Hospital District's power to sue and be sued); Ch. 2004-397, § 4(1)(f), Laws of Fla. (establishing South Broward Hospital District's power to sue and be sued); Ch. 2003-374, § 4, Laws of Fla. (establishing Halifax Hospital Medical Center's power to sue and be sued); Ch. 2000-439, § 4, Laws of Fla. (establishing Lee Memorial Health System's power to sue and be sued).

And even to the extent that the Attorney General correctly asserts the common-law authority to do so, the Legislature removed that authority when it created Appellants and assigned the rights of legal representation of claims to Appellants themselves, not the Attorney General. *Cf. Fried v. State,* 355 So. 3d 899, 909 (Fla. 2023) (finding that, by creating statutes imposing civil penalties against government entities and individual officers for violating a statute preempting firearm and ammunition regulation, the Legislature abrogated common-law immunity of local-government officials "in the context addressed in the Preemption Statute"). If the Legislature can abrogate the long-established common-law immunity of elected officials, it certainly can abrogate any asserted common-law authority of the Attorney General to dispose of local entities' legal claims. Of course, Appellants cannot assert any purported legal rights that are contrary to superior general law. *See id.*

In essence, the Attorney General asserts the unilateral *substantive* authority to dispose of Appellants' claims on behalf of the people of Florida, notwithstanding the enactment of law assigning that authority to Appellants. But the Attorney General is the "chief state legal officer" of the state, *not the client*. Fla. Const. art. IV, § 4(b), Fla. Const. As the state's chief legal officer, the Attorney General has limited common-law authority as *parens patriae* to litigate claims common to the state at large—and, of course, claims authorized by general law, and limited by that law—but not to control claims of Appellants who assert unique and individual actual damages. The Attorney General has no more

10

authority to litigate such claims than the claims of a private hospital asserting its own individual damages.

To hold otherwise would make the Attorney General equal to the Governor and the Legislature. But the Attorney General is not the supreme executive of Florida, who may assert policy prerogatives on behalf of the Governor and the Legislature. The Governor exercises the supreme executive power:

> The *supreme* executive power shall be vested in a governor, who shall be commander-in-chief of all military forces of the state not in active service of the United States. The governor shall take care that the laws be faithfully executed, commission all officers of the state and counties, and transact all necessary business with the officers of government.

Fla. Const. art. IV, § 1(a) (emphasis added). The Governor's supreme executive power authorizes him or her to compel other executive officers, including the Attorney General, to perform their duty:

> The governor may initiate judicial proceedings in the name of the state against any executive or administrative state, county or municipal officer to enforce compliance with any duty or restrain any unauthorized act.

Fla. Const. art. IV, § 1(b).

> The Legislature exercises the legislative power of the state:

> The legislative power of the state shall be vested in a legislature of the State of Florida . . . .

Fla. Const. art. III, § 1. The Legislature may exercise this power to limit the authority of the Attorney General to assert his or her authority to exercise the *parens patriae* power to sue or prohibit other governmental entities to sue for damages. As noted by Justice Ervin:

> Neither the Legislature nor the courts has ever undertaken to delineate or set the outer limits of the

11

Attorney General's litigation power, *although in a few specific instances the Legislature has curtailed his role.*

*State ex rel. Shevin v. Yarborough*, 257 So. 2d 891, 896 (Fla. 1972) (Ervin, J., concurring specially) (emphasis added). Here, the Legislature did just that by creating Appellants and granting them the authority to protect their property interests and to assert legal claims in court.

In addition, by failing to intervene in the Appellants' suits, the Attorney General cannot now circumvent this legislative decision by seeking a declaratory judgment to allow her to extinguish Appellants' asserted damage claims:

> If the Legislature had intended to provide that the Attorney General would be permitted to intervene as a party, with the privilege of filing such pleadings as he might see fit, it is reasonable to suppose that the statute would have so provided. It did not. The statute provides that he should be 'heard,' which means that he should be heard according to the merits of what he presented at the hearing and that he should be amenable to the Court's rulings, as are other petitioners.

*Watson v. Claughton*, 34 So. 2d 243, 246 (1948) (rejecting Attorney General's argument that a court order denying intervention was unlawful). This Court has also held that the Attorney General has no standing to appeal, where the Attorney General did not intervene below as a party but only represented a party in the circuit court. *Bondi v. Tucker,* 93 So. 3d 1106, 1111–12 (Fla. 1st DCA 2012). Here, the Attorney General never intervened in Appellants' suits.

The Attorney General argues unpersuasively that as the state's chief legal officer, she may bar Appellants from representing themselves, while simultaneously denying any interest in representing Appellants. The Attorney General argues that it is her prerogative to eliminate the value of Appellant's individual claims for harms caused by the Opioid Defendants, as a "bargaining chip" to obtain this global financial settlement. Thus, the Attorney General asserts that she may disavow these school

boards' and hospital districts' actual damages for her own negotiating prerogatives.

We note that the question presented is not whether the Department of Legal Affairs, acting by and through the elected Attorney General, has the authority as authorized by law and has limited *parens patriae* authority to represent the state in certain matters belonging to the public at large. Fla. Const. art. IV, § 4(b) ("The attorney general shall be the chief state legal officer."). Section 16.01(2), Florida Statutes (2020), specifies the authority and the duties of the Attorney General as "prescribed by the Constitution of this state and . . . appropriate to his or her office as . . . required of the Attorney General *by law* or by resolution of the Legislature." These duties may include providing opinions when *requested* by the Governor, and other elected state and local officers, including local subdivisions, "relating to the official duties of the requesting officer." § 16.01(3), Fla. Stat. She "shall appear in and attend to, in *behalf of the state,* all suits or prosecutions, civil or criminal or in equity, *in which the state may be a party,* or in anywise interested, in the Supreme Court and district courts of appeal of this state" as well as in federal court. § 16.01(4), (5), Fla. Stat. (emphasis added). The Attorney General shall "have and perform all powers and duties incident or usual to such office." § 16.01(7), Fla. Stat. Under section 16.015, Florida Statutes, the "Department of Legal Affairs shall be responsible for providing all legal services required by any *department,* unless otherwise provided by law." (Emphasis added).

The Attorney General is commanded to study federal legislation and its potential impacts on the "constitutional integrity of state governments," and to inform representatives in Congress from the state. § 16.52(1), Fla. Stat. In addition, under section 922.14, Florida Statutes, the Attorney General is authorized to apply to the Florida Supreme Court to issue a death warrant in a capital case under certain circumstances. Thus, the authority and duties of the Attorney General are broad and encompass a varied field of operation in the courts and in civil and criminal law enforcement.

The Legislature has created Trust Funds to provide resources to the Attorney General to investigate and prosecute Florida's

13

RICO Act, the FDUTPA, the Florida False Claims Act, "or state or federal antitrust laws." § 16.53(1), Fla. Stat.; *see generally Barati v. State,* 198 So. 3d 69, 84–85 (Fla. 1st DCA 2016) (holding that the Attorney General has the authority to dismiss a *qui tam* false claims action over relator's objection despite Attorney General's lack of prior intervention, as such claims are "brought in the name of the state" under section 68.083, Florida Statutes, and the Attorney General is the real party in interest).

But there are limits to the authority of the Attorney General. *See Holland v. Watson,* 14 So. 2d 200 (Fla. 1943); *Watson v. Caldwell,* 27 So. 2d 524 (Fla. 1946). In *Holland,* the supreme court unequivocally rejected the proposition that the Attorney General had authority under the common law to represent non-Executive Branch entities, without their approval:

> [T]he Attorney General filed a bill of complaint in the circuit court seeking to restrain the State Board of Administration from retaining counsel other than the Attorney General. He alleges that under the common law, the statutes, and the Constitution of Florida, it is his exclusive prerogative to represent the said Board. A motion to dismiss the bill was overruled and that judgment is here for review under Rule 34 of the Rules of this Court.

> The question presented is whether or not the Attorney General is under the law the duly authorized legal representative of the State Board of Administration or may the said Board in its discretion retain other counsel to represent it.

> . . .

> In our view, the very terms of Section 16 of Article IX of the Constitution, the magnitude of the power granted, the scope and character of the labor required in its execution, and its importance to the fiscal policy of the counties and special taxing districts force the conclusion that the State Board of Administration is authorized to employ counsel to assist it. *The very fact that it creates the Board a body corporate with power to sue and be sued* and

14

provides the means for it to liquidate a bonded indebtedness for the counties and special road and bridge districts running into hundreds of millions of dollars and extending over a period of fifty years with power to issue refunding bonds and gasoline anticipation certificates *would seem to foreclose the question*. Since we find no intent on the part of the legislature to extend the duties of the Attorney General to that of representing the Board, we are of the opinion that it may employ other counsel to represent it.

14 So. 2d at 200–03 (emphasis added).

In *Watson,* the Supreme Court stated that the Board of Trustees had the authority to retain legal counsel, and the Attorney General did not have the authority to represent the Trustees over that choice. 27 So. 2d at 529. In part, the Court relied on the *implied* authority of the Trustees to sue and be sued, and further noted that in eighty years the organic law had not delegated this exclusive authority of legal representation to the Attorney General:

The Governor and other administrative officers of the Executive Department of the State named in the act were constituted Trustees of the Internal Improvement Fund by Chapter 610 Acts of 1855. Section 2 of that Act contemplated the conduct of law suits and legal actions, and, therefore, the act necessarily implied that the Trustees should have power and authority to employ counsel to represent them in connection with the performance of the duties with which they were and are charged. Every Act of the Legislature from that time down to the present has recognized the power and authority of the Trustees of the Internal Improvement Fund to prosecute and to defend law suits and to engage in transactions which would require the services of an attorney. . . .

. . .

This provision of the statute clearly indicates that the Attorney General is expected to be drawn into

15

litigation as attorney in cases affecting the powers and duties of the Trustees of the Internal Improvement Fund only when and if the State of Florida joins with the Trustees in any action or suit where such intervention is deemed necessary and that in those cases he should come in representing the State of Florida as differentiated from representing the Trustees.

So, our conclusion is that the Trustees of the Internal Improvement Fund are authorized to employ counsel to represent and advise the Trustees in any matter or matters which may be incident to their duties as such Trustees.

27 So. 2d at 528–29. And here, the Attorney General asserts far more legal authority than did the Attorney General in 1943 and 1946. Unlike in *Holland* and *Watson,* here, the Attorney General does not even purport to have represented the Appellants, whereas in those cases, the Attorney General asserted the authority, and the interest, in representing the Board of Trustees and the State Board of Administration.

The Attorney General thus could not seek to disavow actual and individual damages for Appellants as subsumed by her own suit against the Opioid Defendants. Appellants are not Executive-Branch entities somehow subordinate to the Attorney General's legal control.

III.

As noted, the Florida Constitution creates the office of the Attorney General but limits that office's authority to powers conferred by the constitution or assigned in general law or by resolution of the Legislature. The specific authority assigned in organic law relates to matters such as the responsibility to seek advisory opinions from the Florida Supreme Court regarding the validity of constitutional initiatives proposed pursuant to Article IX, section 3 of the Florida Constitution. *See* Fla. Const. art. IV, § 10. But even this responsibility is limited as "directed by general law." *Id.* Nowhere does the organic law authorize the Attorney General to represent without consent, or decline to represent and then attempt to disavow the damages of Appellants.

16

As Appellant North Broward Hospital District correctly summarizes the question presented here, the Attorney General can only represent interests common to the public under her *parens patriae* common-law authority, not specific damages unique to the district, authorized and created by the Legislature with the power to sue to protect those unique interests not common to the public. Nor can the Attorney General rely on consumer-protection statutes—which have specific requirements for making victims whole, including Appellants—to obtain funds from a settlement without their consent, and without compensating them for their suffered harms, for the general purposes of "opioid abatement," without providing any remedies to Appellants for their unique damages inflicted by the Opioid Defendants. *See* § 501.2101(2), Fla. Stat. (stating that monies received by an FDUTPA enforcing authority that are not for attorney fees or litigation and investigation costs "shall accrue to the state and be deposited" in the General Revenue Fund); § 895.09(1)(d), Fla. Stat. (providing that, for distribution of monies obtained from a judgment of forfeiture in an action under Florida's RICO Act, claims for restitution by victims of the racketeering activity are given priority over distributions to a Department of Legal Affairs trust fund).

The Attorney General does not have the legal authority to unilaterally dismiss, for example, actual and individual damages incurred by the two school boards for increased harms and expenditures for compliance with federal law for special educational needs for disabled students—disabled allegedly by the actions of the Opioid Defendants that caused the students or their parents to become addicted to prescription opioids. And this is but one example. The Special Hospital Districts also assert individual and actual damages separate from the general public for harms allegedly inflicted by the Opioid Defendants that caused these hospitals to have to provide specialized medical care for opioid-addicted and harmed patients.

It is not within the Attorney General's power to make such decisions. While it may be in the interest of the Opioid Defendants to see Appellants' claims extinguished, it is not in the public interest of the children and parents of a certain district: "Through a settlement term, the Attorney General has allowed the Opioid Defendants to usurp her authority, which is designed as a shield

for the citizens of Florida, and use it as a sword to defeat certain local entities' claims." Miami-Dade School Board Init. Br. 10.

In conclusion, we do agree with the Attorney General that *res judicata* and preemption doctrines are not relevant here. ("The issue here is whether the Attorney General has the power to release the claims of Florida's political subdivisions. If she does not have that power, then her release was without effect and cannot bind the subdivisions—through res judicata or otherwise."). Because we reject the assertion that the Attorney General has the authority to somehow prohibit Appellants from exercising their constitutional and statutory authority to sue to recover damages from the Opioid Defendants, we need not address arguments based on *res judicata* or preemption. And, of course, the Legislature has not preempted Appellants claims.

No doubt the global settlement achieves many laudable goals. But it cannot deprive Appellants of their legal rights to be made whole for their unique losses. The circuit court erred as a matter of law in granting summary judgment for the Attorney General in the declaratory judgment action. We reverse with direction to enter judgment for all Appellants.

REVERSED.

BILBREY and WINOKUR, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

Barry Richard, Tallahassee, for Appellant Halifax Hospital Medical Center.

George T. Levesque, Jason L. Unger, Stephen K. Varnell, GrayRobinson, P.A., Tallahassee, for Appellant North Broward Hospital District.

18

Frank P. Rainer, Office of General Counsel, Memorial Healthcare System, Hollywood, for Appellant South Broward Hospital District.

Joseph W. Jacquot, Derek K. Mountford, Gunster, Yoakley & Stewart, P.A., Jacksonville, for Appellant School Board of Miami-Dade County.

Steven W. Teppler, Mandelbaum Barrett PC, Roseland, New Jersey; Timothy M. Hartley, Hartley Law Offices, PLC, Fort Lauderdale; David A. Wallace, Morgan R. Bentley, Corinna S. Coser, Bentley Goodrich Kison P.A., Sarasota, for Appellants Sarasota County Public Hospital District and Lee Memorial Health System.

John Wayne Hogan, Terrell Hogan Yegelwel, P.A., Jacksonville, for Appellant Putnam County School Board.

Ashley Moody, Attorney General, John Guard, Chief Deputy Attorney General, Gregory S. Slemp, Special Counsel, Office of the Attorney General, Tallahassee; Henry C. Whitaker, Solicitor General, Daniel W. Bell, Chief Deputy Solicitor General, David M. Costello, Deputy Solicitor General, Office of the Solicitor General, Tallahassee, for Appellee Office of the Attorney General.